## UNITED STATES v. HODGES.
### No. 6541.

Circuit Court of Appeals, Sixth Circuit.
Jan. 8, 1935.

Fendall Marbury, of Washington, D. C., and James B. Frazier, Jr., of Chattanooga, Tenn. (Will G. Beardslee and Wilbur C. Pickett, both of Washington, D. C., on the brief), for the United States.

Frank P. Bowen, of Knoxville, Tenn., and R. L. Ogle, of Sevierville, Tenn. (J. O. Baker and Ray O. Shehan, both of Harlan, Ky., on the brief), for appellee.

Before HICKS, SIMONS and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The suit below was upon a contract of war risk insurance, and the trial resulted in a verdict of the jury against the government. The only meritorious question here is whether the court erred in denying the defendant's motion for a directed verdict on the ground that there was no substantial evidence of the plaintiff's total and permanent disability during the life of the policy.

Hodges enlisted in the military service of the United States February 21, 1918. On February 28, 1918, he was granted a policy of war risk insurance in the sum of $10,000, effective March 10th. Premiums thereon were paid to include the month of April, 1918, after which no premiums were paid, the grace period expiring and the policy lapsing on May 31, 1918. The plaintiff's military service consisted of cooking for the officers' mess at Camp Gordon, Ga., for a month and a half, at the end of which time he had a nervous breakdown, was hospitalized for three or four weeks, and then on April 26, 1918, discharged from the service upon a surgeon's certificate of disability due to "nervous instability, neuropsychosis, prognosis bad." The present suit was begun by petition filed May 16, 1932, which alleged a maturing of the policy on April 26, 1918, through total permanent disability resulting from nervous disorders and affected spine.

The plaintiff, prior to his enlistment in the Army, was by occupation a farmer, but for the five years immediately preceding worked as a lumber camp cook, and weighed 129 pounds. At the time of discharge, he had gained approximately 40 pounds, and since has continued to gain in weight until at one time he reached a maximum weight of 223 pounds. His hair turned gray within six months after discharge. Upon his return from the Army he tried to work as a cook in a restaurant, but his nerves gave way, and he retired to a farm, where he stayed for a period of nearly two years. Thereafter he worked intermittently as a cook, later learned the barber trade and worked intermittently as a barber. Over the period of thirteen years between discharge and trial, he was compelled to cease work at least twenty times on account of his nervous condition. The record nevertheless shows that during all these years, in spite of many interruptions due to nervous spells, he worked for periods of time ranging from three weeks to five months in substantially gainful occupations.

The medical evidence was to the effect that the plaintiff was suffering from a nervous condition due to a disturbance of the pituitary gland, and a homo-sexual affliction which was not in itself disabling, and for which work was benign rather than the reverse. The first medical examination was made in the latter part of 1919, at least one and a half years after the plaintiff was discharged from the Army, and the last in November, 1932. The finding that the trouble was a disturbance of the pituitary gland was first made by Dr.

618

Hoffman, a nerve specialist, in 1929. The only medical evidence that tended to carry the plaintiff's disability back to the period covered by the policy was that of Dr. Hoffman, who testified that glandular disturbance is progressive, and that its development is always gradual, sometimes taking twelve or fifteen years. There was also evidence on the part of the defendant, uncontradicted on the record, that psycho neurosis is a mental and nervous condition of a functional rather than an organic nature.

The war risk contract insures against total, permanent disability. Regulation No. 11, promulgated by the director of the bureau, is to the effect that any impairment of mind or body, which renders it impossible for the disabled person to follow continuously any substantially gainful occupation, shall be deemed to be total disability, and that total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it. This regulation has been construed with varying degrees of refinement. We cite but a few of the cases. United States v. Eliasson, 20 F.(2d) 821 (C. C. A. 9); Ford v. United States, 44 F.(2d) 754 (C. C. A. 1); Madray v. United States, 55 F.(2d) 552 (C. C. A. 4); United States v. Acker, 35 F.(2d) 646 (C. C. A. 5); Carter v. United States, 49 F.(2d) 221 (C. C. A. 4); United States v. Scott, 50 F.(2d) 773 (C. C. A. 6); Bartee v. United States, 60 F.(2d) 247 (C. C. A. 6). It becomes unnecessary, however, to analyze the decisions, for the whole matter has been summed up in the recent decision of Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 276, 78 L. Ed. 492. It was there said: "The above quoted administrative decision is not, and manifestly was not intended to be, an exact definition of total permanent disability or the sole guide by which that expression is to be construed. If read literally, every impairment from time to time compelling interruption of gainful occupation for any period, however brief, would be total disability." The Supreme Court, however, refused to accept a literal reading of the regulation, since such a construction would be unreasonable and contrary to the intention of Congress. The phrase "total permanent disability" is to be construed reasonably and having regard to the circumstances of each case. "Permanent disability" means that which is continuing as opposed to what is temporary. Separate and distinct periods of temporary disability do not constitute that which is permanent. The mere fact that one has done some work after the lapse of his policy is not of itself sufficient to defeat his claim of total permanent disability. He may have worked when really unable, and at the risk of endangering his health or life, but manifestly work performed may be such as conclusively to negative total permanent disability at the earlier time.

It seems to us clear that under the statute and regulation thus construed, the work record of the plaintiff, however interrupted from time to time by his nervous condition, is in negation of an inference of total permanent disability, however sufficient its interruptions might be to warrant an inference of temporary total disability, or permanent partial disability. Bartee v. United States, supra, and United States v. Scott, supra, do not compel a contrary conclusion, and in any event were decided when it was generally thought that the applicable regulation was entitled to a more literal interpretation than was later given to it by the Supreme Court in the Lumbra Case.

But aside from conclusions to be drawn from the plaintiff's work record, the evidence wholly fails to support any reasonable inference that total permanent disability resulted during the brief life of the policy. To say that a glandular disturbance is progressive, and gradual, taking twelve or fifteen years to develop, might perhaps carry the beginning of the plaintiff's affliction back to the period during which the policy was in force, or likewise to an earlier period. It does not, however, with any reasonable certainty indicate when total disability resulted. To permit the jury to fix impairment within a period of less than two months out of a possible twelve or fifteen years is to submit a factual issue to speculation and guess and not to reasonable inference. The mere fact that the plaintiff had a nervous breakdown during the life of the policy is symptomatic, but indicates nothing either as to the extent or as to the permanence of the condition.

Finally the claim of permanent and total disability is negatived by the plaintiff's own conduct reflecting his opinion as to whether he was totally and permanently disabled at the time of the lapse. It was noted in the Lumbra Case, supra, that the failure of the plaintiff there to assert any claim for a decade showed that he did not believe that he was totally and permanently disabled when he let his policy lapse. Here the petitioner's delay in bringing the suit was a period of over fourteen years from the time it is claimed the pol-

icy matured. This is, when unexplained, strong evidence that he was not totally and permanently disabled before the policy lapsed.

We conclude there was error in overruling the defendant's motion for peremptory instructions. Reversed and remanded for further proceedings consistent herewith.